# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

CYBERGUN, S.A., *et al*.,

     Plaintiffs,

v.

JAG PRECISION,

     Defendant.

Case No. 2:12-CV–0074-KJD-GWF

**ORDER**

     Presently before the Court is Plaintiffs' Motion for Preliminary Injunction (#33).  Defendant filed a response in opposition (#39) to which Plaintiffs replied (#42).  The Court also considered both Defendant's Supplemental Response to the Motion (#53) and Plaintiffs' Supplement (#55) to their Motion for Preliminary Injunction.  Defendant also filed Objections (#57).

I.  Background

     Plaintiff, Cybergun, is the holder of an exclusive license to sell airsoft guns, airguns, and paint ball guns which are replicas of firearms designed and trademarked by Plaintiff FN Herstal ("FNH").  FNH is a world-famous manufacturer, designer and supplier of small caliber weapons, components, accessories and ammunition and has demonstrated expertise in the sales, marketing and distribution of small caliber weapons, components, accessories and ammunition for military, law enforcement and commercial applications.

*The M249 and M249 PARA*

FNH developed the first FN M249 over three decades ago and has used the trademark M249 since that time to identify the FN M249 as originating from FNH.  Since at least 1992, FNH's M249 firearm has employed a very unique and inherently distinctive design.  Specifically, the M249 has included a combination of a pistol grip having lateral grooves, a contoured carrying handle extending from the top of the barrel, a groove where the stock widens, a rounded portion that protrudes in the upper portion of the rear of the stock, a rear aperture sight, and the gun's overall dimensions and shape.  In addition to the FN M249, FNH developed the M249 PARA dating back more than 30 years, and has likewise used the trademark M249 PARA since that time to identify the FN M249 PARA as originating from FNH.  In its current configuration, which dates back to the 1990s, the FN M249 PARA includes a combination of a pistol grip having lateral grooves, a contoured carrying handle extending from the top of the barrel, two rods coupled by a bridge to form the stock at the rear of the gun, the bridge having an additional circular opening on a visible interior portion, a rear aperture sight, and the gun's overall dimensions and shape.

Upon introduction, the M249 and M249 PARA firearms were adopted by the U.S. Military and became recognized as the latest in a long line of high quality FNH products. The firearms have enjoyed impressive sales over many years.  Because of their popularity, the M249 and M249 PARA firearms have been featured in various popular video games, including the popular Call of Duty and Battlefield Games.  Millions of purchasers have been exposed to these guns by virtue of their appearance in these and other popular video games.  Through these appearances, as well as appearances in various famous movies and television shows, the knowledge and popularity of these firearms has grown, thus adding additional value to the trade dress in which the firearms are cloaked and to the trademarks under which they are advertised and sold.  Additionally, airsoft gun dealers market Jag's copies as "M249 Style" guns, providing further evidence of the commercial and ornamental distinctiveness of Plaintiffs' M249 trade dress.

*THE P90*

FNH developed the first FN P90 over three decades ago and has used the trademark P90 since that time to identify the FN P90 as originating from FNH. Since at least 1990, FNH's P90 firearm has employed a very unique and inherently distinctive design. Specifically, the P90 has included a combination of a thumbhole acting as a pistol grip, an oversized trigger guard, smooth contours, bullpup configuration, a horizontally mounted feeding system, and the gun's overall dimensions and shape. Upon introduction, the P90 quickly became recognized as another high quality FNH product. The firearms have enjoyed impressive sales over many years.

Like the M249 and M249 PARA firearms, the P90 firearm has been featured in various popular video games, including the popular Call of Duty and Battlefield Games. Millions of purchasers have been exposed to the P90 by virtue of its appearance in these and other popular video games. Through these appearances, as well as appearances in various famous movies and television shows, the knowledge and popularity of these firearms has grown, thus adding additional value to the trade dress in which the P90 is cloaked and to the P90 trademark under which the firearm is advertised and sold. Additionally, airsoft gun dealers market Jag's copies as "P90 Style" guns, further proving the commercial and ornamental distinctiveness of Plaintiffs' P90 trade dress.

*THE LICENSE*

Cybergun is a leader in manufacturing and distributing high quality air soft guns, model guns, air guns, paintball guns, and electronic and non-electronic games relating to using replicas of existing weapons, ammunition and projectiles. Due to the recognized value of FNH intellectual property, on June 25, 2010, FNH and Cybergun executed a license agreement whereby FNH granted to Cybergun the exclusive rights to manufacture, distribute, advertise, and sell, directly or indirectly, replicas of various firearm designs owned by FNH, including but not limited to the FN SCAR rifle, the FN M249 and FN M249 PARA firearms, and the FN P90. Through this license, Cybergun has an exclusive, worldwide license to sell airsoft guns, air guns and paint ball guns embodying the proprietary M249, M249 PARA, and P90 firearm design and trademarks.

1  *INTELLECTUAL PROPERTY RIGHTS IN M249 AND P90 FIREARMS*

2       Given their distinctive design, the M249 and P90 guns enjoy trade dress rights.  FNH has

3  enjoyed very significant sales over many years, including the notoriety that comes from being a

4  provider to the U.S. Military.  Due to their use, advertising and sales, consumers now recognize the

5  M249, M249 PARA, and P90 firearms as high-quality products that derive from or are authorized by

6  FNH.  The high value of the trade dress has been enhanced by the extensive use of these firearms in

7  the Call of Duty and Battlefield (and other) video games. The video games even directly attribute the

8  FN P90 design and trademark to FN Herstal.  The video game usage of the M249 and P90 designs

9  adds significant value to Cybergun because video gamers are target end users for Cybergun products.

10  For example, the informational websites for these video games include advertisements for air soft

11  guns.  As with the FN SCAR, Cybergun believes video gameplayers who use the M249 and P90 in

12  video games are likely to buy air soft guns, air rifles and paintball guns that look exactly like the guns

13  available on the game.  Buyers of the M249 and P90 guns expect a high quality product and know

14  that it comes from or is authorized by FNH.

15       Cybergun's license includes all rights to the design, including trade dress rights, and

16  trademarks for use with air soft guns, air guns and paintball guns.  FNH sells to the Army, to the

17  United States Special Operations, and non-military customers.  Information relating to FNH's sales

18  to the U.S. Military is classified information, but sales of the entire line of M249-branded firearms

19  across all customers are very substantial, totaling in the hundreds of millions of dollars.  The P90 has

20  enjoyed similar success over the decades it has been sold.

21       In regard to non-military sales of the present M249 guns, FNH and Cybergun have sold over

22  one thousand units in the last 8 years alone, earning millions of dollars of revenue.  In regard to non-

23  military sales of the present M249 PARA guns, FNH and Cybergun have again sold over one

24  thousand units in the last 8 years alone, totaling millions of dollars of revenue.  In regard to non-

25  military sales of the P90 guns, FNH and Cybergun have sold well over one thousand units in the last

26  eight years alone, again resulting in millions of dollars of revenue.

1    With regard to the number of customers, apart from the United States military, FNH has

2  approximately 20,000 non-governmental customers.  FNH and Cybergun are unable to pinpoint the

3  total amount of money spent advertising of the M249, M249 PARA, and P90 guns, either because

4  the records are old or because they do not keep them.  However, paid advertising has been done on

5  the internet and in print ads.  Due to the notoriety the firearms have enjoyed due to their use by the

6  United States military for which the firearms were developed, the value of the firearms and the

7  intellectual property rights associated with them has soared.

8    Cybergun and its subsidiaries enjoy a market share of approximately 30% in the United

9  States, which makes Cybergun a relatively large player given the highly competitive nature of the air

10  soft, air gun and paintball market.  In addition to years of continuous use of the M249, M249 PARA,

11  and P90 trademarks, Plaintiff FNH has been granted a registration for the P90 trademark, which

12  registration dates back to 1996.

13  *DEFENDANT JAG PRECISION'S ACTS*

14    Jag imports, distributes and sells air soft rifles, which can be used to fire BB pellets,

15  paintballs, and other non-bullet projectiles.  Jag advertises, distributes and sells within the United

16  States.  Recently, Jag advertised and offered for sale identical copies of the M249, M249 PARA, and

17  P90 firearm design, using the very trademarks used by Plaintiffs to sell their guns.  The specific

18  products that Plaintiffs alleged infringe Cybergun's rights include the ECHO1 USA M249 MKII, the

19  ECHO1 USA M249 PARA, and the ECHO1 USA E90 ("the Infringing Products").

20    Comparing the proprietary M249, M249 PARA, and P90 design and Jag's Infringing

21  Products reveals that Jag has deliberately copied Plaintiffs' proprietary designs.  Specifically, among

22  other things, Jag's M249 MKII features a design with the pistol grip having lateral grooves, the

23  contoured carrying handle extending from the top of the barrel, the groove where the stock widens,

24  the rounded portion that protrudes in the upper portion of the rear of the stock, the rear aperture sight,

25  and the overall dimensions and shape of Plaintiffs' M249 firearm design.  Close inspection reveals

26  that Jag's ECHO1 USA M249 PARA and the ECHO1 USA E90 are almost identical copies of

1  Plaintiffs' proprietary designs.  Plaintiffs have now moved for a preliminary injunction barring

2  Defendant from selling or offering for sale any Infringing Products and from advertising for sale any

3  Infringing Products or any advertising using Plaintiffs' trademarks, including using Plaintiffs' marks

4  in metatags.

5  II.  Standard for Injunctive Relief

6         A plaintiff seeking a preliminary injunction under the Copyright Act must establish: (1) that

7  he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of

8  preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the

9  public interest.  See Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 979 (9th Cir. 2011)(citing Winter

10 v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008)).

11         A. Likelihood of Success on the Merits

12        To recover for the infringement of a trademark or trade dress under section 43(a) of the

13 Lanham Act, a plaintiff must establish that (1) "the ... design is nonfunctional," (2) "the design is

14 inherently distinctive or acquired distinctiveness through secondary meaning," and (3) "there is a

15 likelihood of confusion that the consuming public will confuse [the plaintiff's and the defendant's

16 products]." See Disc Golf Ass'n v. Champion Discs, Inc., 158 F.3d 1002, 1005 (9th Cir. 1998).

17        1.  Functionality

18        Under the Lanham Act, Congress imposes a presumption of functionality, and

19 Plaintiffs bear the burden of proving non-functionality. 15 U.S.C. § 1125(a)(3) ("In a civil action for

20 trade dress infringement under this chapter for trade dress not registered on the principal register, the

21 person who asserts trade dress protection has the burden of proving that the matter sought to be

22 protected is not functional."); Secalt S.A. v. Wuxi Shenxi Const. Mach. Co., 668 F.3d 677 (9th Cir.

23 2012).  Therefore, Plaintiffs, as the "one[s] who seeks to establish trade dress protection must carry

24 the heavy burden of showing that the feature is not functional, for instance by showing that it is

25 merely an ornamental, incidental, or arbitrary aspect of the device." Traffix Devices, Inc. v. Mktg.

26 Displays, Inc., 532 U.S. 23, 30 (2000).  In cases of product design, the Supreme Court has counseled

1  "that design, like color, is not inherently distinctive." <u>Wal–Mart Stores, Inc. v. Samara Bros.</u>, 529

2  U.S. 205, 212 (2000).

3          In <u>Secalt</u>, the Ninth Circuit emphasized that for an overall product configuration to be

4  recognized as a trademark, the entire design must be nonfunctional.  668 F.3d at 683 (citing

5  <u>Leatherman Tool Grp. v. Cooper Indus.</u>, 199 F.3d 1009, 1012 (9th Cir.1999)); <u>see also</u> <u>Tie Tech, Inc.</u>

6  <u>v. Kinedyne Corp.</u>, 296 F.3d 778, 786 (9th Cir.2002) (foreclosing a finding of nonfunctionality

7  where "the whole is nothing other than the assemblage of functional parts.")  "*De facto*" functionality

8  means that the "design of a product has a function, i.e., a bottle of any design holds fluid," whereas

9  "*de jure*" functionality means that the "product is in its particular shape because it works better in

10 this shape." <u>Leatherman</u>, 199 F.3d at 1012 (internal quotations omitted).  "[B]efore an overall

11 product configuration can be recognized as a trademark, the entire design must be arbitrary or non *de*

12 *jure* functional." <u>Id.</u>

13         This action may be distinguished from <u>Secalt</u> and <u>Leatherman</u>, where courts found the

14 design functional, because Plaintiffs have successfully met their burden in establishing that the

15 overall product configuration serves a non-functional purpose, i.e., it identifies upon sight the firearm

16 in question as a specific weapon made by a specific manufacturer.  The plaintiffs in <u>Secalt</u> and

17 <u>Leatherman</u> failed, because the product in question had:

18             . . .an appearance, as every physical object must.  There is no evidence, however, that
              anything about that appearance (other than the Leatherman name) exists for any
19            nonfunctional purpose. Rather, every physical part of the Leatherman [tool] is *de jure*
              functional....[T]he evidence showed, as in <u>Textron</u>, that "the product is in its
20            particular shape because it works better in this shape.

21 <u>Id.</u> at 1013 (quoting <u>Textron, Inc. v. U.S. Int'l Trade Comm'n</u>, 753 F.2d 1019, 1025 (Fed.Cir. 1985)).

22 Just like the products in <u>Secalt</u> and <u>Leatherman</u>, the firearms at issue in this action have an exterior

23 appearance.  However, though they function as firearms, they are uniquely identifiable by their

24 appearance.  They perform the functions necessary, but the appearance sets them apart from each

25 other and other firearms, unlike the industrial traction hoist in <u>Secalt</u> and the folding tool in

26 <u>Leatherman</u>.  There has been no evidence submitted that the firearms are *de jure* functional, i.e., that

7

1   they work better in their shape and configuration.  Thus, they are not merely an assemblage of

2   functional parts.  Applying the Disc Golf factors buttresses this conclusion.

3            To determine whether a product feature is functional, the court considers several

4   factors: (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are

5   available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the

6   particular design results from a comparatively simple or inexpensive method of manufacture.  Disc

7   Golf, 158 F.3d at 1007.  No one factor is dispositive; all should be weighed collectively.  See Int'l

8   Jensen, Inc. v. Metrosound, U.S.A., 4 F.3d 819, 823 (9th Cir. 1993).  In this action, Plaintiffs have

9   met their initial burden justifying preliminary injunctive relief, because Plaintiffs have adequately

10  demonstrated that each of the elements favor finding that the design of the firearms in nonfunctional.

11  First, the design yields no particular utilitarian advantage to the firearm.  Defendant has failed to

12  identify any specific advantage in either the manufacture or use of the product based on its design.

13  Second, it is unquestioned that there are numerous alternative designs for firearms and airsoft guns.

14  Third, no specific advertising had been identified that touts the utilitarian advantages of the design.

15  Finally, Plaintiffs deny that the design results from a comparatively simple or inexpensive methods

16  of manufacture.  Defendant has provided no evidence to refute this.

17           Thus, under the reasoning of Secalt and Leatherman, and applying the Disc Golf

18  factors, the Court cannot find that the overall product configuration of the three firearms is purely

19  functional.  "Although various features of a product may not be protected as trade dress because

20  these features are functional, a combination of visual elements taken together may create a distinctive

21  visual impression and thus entitles an owner to trade dress protection.  One does not focus on the

22  individual components but on the integration of those components into a single product."  Sunbeam

23  Prods., Inc. v. West Bend Co., 39 U.S.P.Q.2d 1545, 1549 (S. Miss. 1996)(citing Two Pesos, Inc. v.

24  Taco Cabana, 505 U.S. 763 (1992)).  Thus, Plaintiffs have met their burden in demonstrating the

25  overall product configuration is nonfunctional.

26

1                            2. Inherently Distinctive or Acquired Secondary Meaning

2            Defendant asserts that Plaintiffs cannot show that the firearms have acquired a

3    secondary meaning, because airsoft consumers buy the products with the intention of imitating

4    United States Armed Forces, not because of their association with Cybergun or FN Herstal.

5    However, a licensee's use of trade dress inures to the benefit of the trademark owner or licensor.  See

6    Barcamerica Int'l USA Trust v. Tyfield Imps., Inc., 289 F.3d 589, 595 (9th Cir. 2002)( (a licensee's

7    use of a mark inures to the licensor's benefit)(citing Moore Bus. Forms v. Ryu, 960 F.2d 486, 489

8    (5th Cir 1992)(citing Taco Cabana Int'l, Inc. v. Two Pesos, Inc.. 932 F.2d 1113, 1122 (5th Cir.

9    1991)).  Thus, the fact that the military forces use the firearms is evidence of secondary meaning,

10   whether or not the public knows that the source is FNH. See Maljack Productions, Inc. v.

11   GoodTimes Home Video Corp., 81 F.3d 881, 887 (9th Cir. 1996)("a showing of secondary meaning

12   only requires proof that the public associates the movie title with a single source, even if that source

13   is anonymous"); Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366, 380 (7th Cir.)(secondary

14   meaning is established "if the public is aware that the product comes from a single, though

15   anonymous source"); Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 940 (10th Cir.

16   1983)("To establish secondary meaning, it is not necessary to show that the public is aware of the

17   name of the manufacturer of a product; it is sufficient if the public is aware that the product comes

18   from a single, though anonymous source").  Here, Plaintiffs have shown that the weapons in question

19   are highly associated with the United States military, a licensed user.  Furthermore, Plaintiffs have

20   gone farther in showing that the firearms in question are featured in popular video games which

21   clearly identify FN Herstal as the manufacturer of the weapons.

22           Additionally, in this action, Defendant has not addressed the other evidence of

23   secondary meaning: (1) the millions in dollars of annual sales of the firearms; (2) the decades-long,

24   continuous presence in the market; (3) the license; and (4) the presence of the firearms in television,

25   movies, and other media.  Finally, supporting an inference of secondary meaning is the undisputed

26   fact that Defendant copied the firearms.  See Swatch, S.A. v. SIU Wong Wholesale, 1992 WL

142745, *6 (S.D.N.Y. 1992)("Evidence that the trade dress or product design was intentionally copied by a competitor can support an inference of secondary meaning if the circumstances indicate an intent to benefit from the goodwill of the prior user through confusion.") Thus, Plaintiffs have met their burden in demonstrating secondary meaning.

### 3.  Likelihood of Confusion

Plaintiffs have also met their burden in demonstrating a likelihood of confusion. First, Defendant's assertion that differences in labeling alone are enough to avert confusion had already been rejected by this Court when it issued its initial injunction regarding the FN SCAR firearm.  See also, Taco Cabana Int'l. 932 F.2d at 1122 (in trade dress case where defendant's restaurant had a different name but similar trade dress, the issue "is not whether consumers can read signs and menus that identify different restaurants, but whether consumers assume some affiliation between [plaintiff] and [defendant]") aff'd 505 U.S. 763 (1992); Fiji Water Co. v. Fiji Mineral Water USA, LLC, 741 F. Supp.2d 1165, 1176 (C.D. Cal. 2010).  Thus, merely changing a letter in the name of the nearly identical airsoft gun, from P90 to E90, is not likely to reduce confusion.

Second, applying the Sleekcraft factors, the Court finds that Plaintiffs have easily established a likelihood of confusion.  In order to succeed on the merits for its trade dress infringement claim, Plaintiffs must also show that the design will probably cause consumer confusion as to the source or sponsorship of the product—in other words, that consumers will think that the firearms are produced by or affiliated with Plaintiffs.  Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215 (9th Cir.1987) ("Likelihood of confusion requires that confusion be probable, not simply a possibility."). The Ninth Circuit has identified eight factors ("the Sleekcraft factors") to help guide the analysis to determine whether such confusion is likely: (1) the similarity of the mark(s) or trade dress, (2) the strength of the mark(s) or trade dress, (3) evidence of actual confusion, (4) the proximity or relatedness of the goods, (5) the degree to which the marketing channels used for the goods converge, (6) the type of goods and the degree of care likely to be exercised by the purchasers, (7) the defendant's intent in selecting the mark or trade dress, and (8) the

1  likelihood of expansion of the product lines. <u>AMF Inc. v. Sleekcraft Boats</u>, 599 F.2d 341 (9th Cir.

2  1979)(abrogated in part on other grounds as recognized in <u>Mattel, Inc. v. Walking Mountain Prods.</u>,

3  353 F.3d 792 (9th Cir.2003)).  The test is a pliant one—some factors are more important than others,

4  and the factors need not be mechanically added up in order to find a likelihood of confusion.

5  <u>Dreamwerks Prod. Group, Inc. v. SKG Studio</u>, 142 F.3d 1127, 1129 (9th Cir.1998).

6          Here, a majority of the factors favor a finding of a likelihood of confusion.  First, the

7  similarity of the trade dress or trademark is almost identical.  Second, the strength of the dress is

8  strong as many consumers recognize the firearms by their design.  The marketing channels for the

9  firearms are almost identical.  Defendant's intent in copying the firearms is admitted.  Therefore, a

10  majority of the factors strongly favor the Court's finding that a likelihood of confusion exists.  The

11  Court finds that no factors favor a finding that no likelihood of confusion exists.

12          4. Summary

13          The Court finds that Plaintiffs have adequately met their burden in demonstrating that

14  a preliminary injunction should issue as to each firearm addressed in this motion.  In addition to

15  finding that Plaintiffs are likely to succeed on the merits, the Court finds that Plaintiffs will be

16  irreparably harmed by Defendant's infringement on Plaintiffs' trade dress and trademark.  <u>See</u>

17  <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.</u>, 571 F.3d 873, 877 (9th Cir. 2009)

18  ("irreparable injury may be presumed from a showing of likelihood of success on the merits" in trade

19  dress and trademark actions).  Furthermore, the balance of equities tips in Plaintiffs' favor because

20  Plaintiffs will be damaged by Defendant's infringing behavior where Defendant will only have to

21  stop marketing and selling the infringing products which are only a portion of its product offerings.

22  Finally the public interest will not be adversely affected by a preliminary injunction.  The public

23  interest favors a preliminary injunction where there is a likelihood of confusion.  <u>See Fiji Water</u>, 741

24  F. Supp.2d at 1183.  Avoiding confusion to the consumers is a public interest.  <u>See Internet</u>

25  <u>Specialties West, Inc. v. Milon-Digiorgio Enters.</u>, 559 F.3d 985, 993 (9th Cir. 2009).

26

IV.  Conclusion

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction (#33) is **GRANTED**;

IT IS FURTHER ORDERED that Plaintiffs file a proposed injunction within ten (10) days of the entry of this order.

DATED this 11th day of October 2012.

Kent J. Dawson
United States District Judge

12